**EXHIBIT "B"**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| OCEAN INNOVATIONS, INC., *et al.*, | ) | Case No.: 5:98 CV 1515 |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| RICK ARCHER, *et al.* | ) | |
| | ) | |
| Defendants | ) | ORDER |

## I. BACKGROUND

Plaintiff Ocean Innovations, Inc. is the owner by assignment of United States Patent No. 5,529,013
(the "'013 patent"), entitled "Floating Drive-On Dry Dock Assembly." Ocean Innovations, Inc. also owns
United States Patent No. 5,682,833 (the "'833 patent"), which is the continuation of the '013 patent.
Plaintiff Jet Dock Systems, Inc. is the sole licensee under the '833 patent.[1]  In broad terms, the invention
of the '833 patent is a method of placing a small watercraft on a floating dry dock, which is assembled from
a group of floatation units.  The dock is meant to allow an operator of a craft to drive the bow of the craft

---

[1]    Ocean Innovations, Inc., together with Jet Dock, will be referred to as "Plaintiffs" or "Jet
Dock".

onto the dock so that the craft can be stored fully out of the water and the driver can get on and off the craft without getting in the water.    In this action, Plaintiffs claim that Defendant Zeppelin Marine, Inc.'s ("Zeppelin") floating drive-on dry dock, the Sport Port Ultra ("Ultra"), infringes Claims 1 and 4 of the '833 patent.[2]

      Claim 1 of the '833 patent, the only independent claim at issue, provides as follows:

> 1.   A method of placing a floating craft having a hull with an upwardly curved bow onto a dry dock comprising the steps of:
>
> selecting a plurality of floatation units from a first group of floatation units having a first buoyancy and a second group having a second buoyancy, the second group being less buoyant than the first group, so that the selected units have a total buoyancy sufficient to support the craft with its lowermost portion out of the water,
>
> assembling the selected units to form a dock having an axial extent defining a craft-receiving surface which is above the surface of the water when the dock does not have a craft on it, using flexible joints between the units which permit adjacent units to flex downwardly with respect to each other upon the imposition of a downward load,
>
> driving the craft up and onto the dock by forcing the bow of the craft against the floatation units at one axial end of the dock to force the units downward in the water beginning at the one axial end of the dock and moving progressively toward the other axial end of the dock as the craft moves axially along the dock.[3]

---

[2]    Defendant Rick Archer was dismissed from this lawsuit on May 19, 1999.

[3]    Claim 4, which is completely dependent on Claim 1 is also at issue.  Claim 4 covers:

> The method of claim 1 wherein the floatation units have generally planar top surfaces and the step of driving the craft up and onto the dock includes driving the craft up and onto the dock so that its hull presses downward on the top surface of at least some of the units so as to prevent those units from flexing with respect to the adjacent units.

'833 patent, col. 7, ll. 28-45, col. 8, ll. 1-6.

At issue in this Order is the proper construction of the terms "floatation unit" and "flexible joint between the units" in Claim 1. On July 31, 2000, the court held a *Markman* hearing on the construction of these two terms.

## II. STANDARD OF REVIEW

A court's consideration of a patent infringement claim is a two step process. The first step is for the court to make the legal determination of how the claim terms at issue are to be construed. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir.1995). The second step is to determine whether the accused product infringes, either literally or by equivalents, by comparing the properly construed claims to the accused product. *Id.* As just noted, the court will address in this Order the proper construction of the terms "floatation unit" and "flexible joint between the units" in Claim 1 of the '833 patent. The issue of infringement will be addressed once the parties have informed the court if they wish to supplement their prior motions for summary judgment based on the court's claim construction.

Construction of patent claims is exclusively within the province of the court to determine as a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). As discussed in more detail below, the court must begin its construction analysis with intrinsic evidence, that is, the claim itself, the patent specification, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specification and, if in

---

'833 patent, col. 8, ll. 15-20.

- 3 -

evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."). Under some circumstances, a court may also consult evidence extrinsic to the patent, such as expert testimony, to determine how those skilled in the relevant art would interpret the claims. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).

In evaluating the intrinsic evidence, the court must first "look . . . to the claim language itself to define the scope of the patented invention." *Bell Atlantic Network Servs., Inc. v. Covad Comm. Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The court is to "give[] claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art." *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000); *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002) ("The terms used in the claims bear a 'heavy presumption' that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art."). This requirement extends to technical terms, which must be given "the meaning that [they] would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning." *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996).

The Federal Circuit in *Texas Digital* recently clarified the extent to which dictionaries, encyclopedias and treatises may be used to assist the court in determining the ordinary and customary meanings of claim terms. Noting that its precedents have long recognized that such sources are particularly useful in determining the ordinary and customary meaning of claim terms, the court explained they "are always available to the court to aid in the task of determining meanings that would have been attributed by

- 4 -

those of skill in the relevant art to any disputed terms used by the inventor in the claims." *Texas Digital*, 308 F.3d at 1202. It reasoned that dictionaries, encyclopedias and treatises are "objective resources that serve as reliable sources of information on the established meanings of [claim terms and] . . . [i]ndeed, . . . may be the most meaningful sources of information to aid judges in better understanding both the technology and the terminology used by those skilled in the art to describe the technology." *Id.* at 1203.

The *Texas Digital* court went on to explain, though, that the intrinsic record, such as the patent specification, must still always be examined to identify "which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor." *Id.* Another purpose of examining the intrinsic record is to determine whether there is anything in it that rebuts the presumption that a claim term should be construed in accordance with its ordinary and customary meaning. The court set forth the following criteria courts should evaluate in determining whether this presumption has been overcome:

> [i]n short, the presumption in favor of a dictionary definition will be overcome where the patentee, acting as his or her own lexicographer, has clearly set forth an explicit definition of the term different from its ordinary meaning. . . . Further, the presumption also will be rebutted if the inventor has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope. . . .

*Id.* at 1204 (citations omitted). The Federal Circuit ended its discussion with a cautionary instruction that a court should start its claim construction analysis with dictionaries, encyclopedias and treatises and only then turn to the intrinsic record to determine if the patentee placed any limitations on the ordinary meaning of the terms at issue. According to the court, "[c]onsulting the written description and prosecution history as a threshold step in the claim construction process, before any effort is made to discern the ordinary and

- 5 -

customary meanings attributed to the words themselves, invites a violation of our precedent counseling against importing limitations into the claims." *Id.* at 1205. As it pointed out, "if the meanings of the words themselves would not have been understood to persons of skill in the art to be limited only to the examples or embodiments described in the specification, reading the words in such a confined way would mandate the wrong result and would violate our proscription of not reading limitations from the specification into the claim." *Id.* at 1205 (citations omitted).[4]

Finally, a court may, in its discretion, consider extrinsic evidence in order to correctly understand and define the language of the claims. *See Markman*, 52 F.3d at 980. Because "a judge is not usually a person conversant in the particular technical art involved and is not the hypothetical person skilled in the art to whom a patent is addressed, extrinsic evidence may be necessary to inform the court about the language in which the patent is written." *Id.* at 986. However, "[e]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." *Id.* at 981; *see also Vitronics*, 90 F.3d at 1584. Opinion testimony of experts and the inventor should be treated with "utmost caution" and may only be relied upon if the patent documents taken as a whole are insufficient to enable the court to construe disputed claim terms. *Id.* at 1584-85.

## III. ANALYSIS

### A. Step-Plus-Function

---

[4] There are a number of rules of construction that specifically relate to prosecution history. The court will not address them, however, as the parties are in agreement that the prosecution history has no effect on the construction of the two terms at issue here.

To begin, the court must address Zeppelin's argument that the first step of Claim 1 of the '833

patent is drafted in step-plus-function format in accordance with 35 U.S.C. § 112, paragraph 6.[5] Claim

elements drafted in this format incorporate the normal rules of claim construction but are subject to the

additional statutory limitations set forth in § 112, paragraph 6, which provides:

> [a]n element of a claim for a combination may be expressed as a means
> or step for performing a specified function without the recital of structure,
> material, or acts in support thereof, and such claim shall be construed to
> cover the corresponding structure, material, or acts described in the
> specification and equivalents thereof.

35 U.S.C. § 112, paragraph 6. The scope of a step-plus-function claim is limited to the acts disclosed in

the specification and their equivalents. *OI Corp. v. Tekmar Co., Inc.*, 115 F.3d 1576, 1583 (Fed Cir.

1997) (noting that "the price that must be paid for" the convenience of claiming without specificity a step

for accomplishing a particular function is a sharp limitation in the scope of the claim).

In the context of method claims, such as Claim 1, "section 112, paragraph 6 is implicated . . . only

when steps plus function without acts are present." *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*,

279 F.3d 1022, 1028 (Fed. Cir. 2002). The provision is not triggered "[m]erely [by] claiming a step by

itself, or a series of steps, without recital of a function." *Id.* The Federal Circuit has further held that a

preamble statement of purpose does not necessarily supply a function for step-plus-function format. *O.I.*

*Corp.*, 115 F.3d at 1583. While use of the term "step for" in a method claim signals the drafter's intent

---

[5]   While the parties did not address this issue in their *Markman* briefs or at the   *Markman*
hearing, the court has decided to address it in this Order rather than in an Order on
infringement because "[w]hether the language of a claim is to be interpreted according to
35 U.S.C. § 112, ¶ 6 . . . is a matter of claim construction. . . ." *Apex Inc. v. Raritan
Computer, Inc.*, 325 F.3d 1364, 1371 (Fed. Cir. 2003) (quoting *Kemco Sales, Inc. v.
Control Papers Co., Inc.*, 208 F.3d 1352 (Fed.Cir.2000)).

to invoke § 112, paragraph 6, method claims that are drafted by reciting the phrase "steps of" followed by a list of actions comprising the method claimed do *not* indicate a drafter's intent to invoke this provision. *Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002). Applying § 112, paragraph 6 to method claims drafted in the latter manner "would render the scope of coverage of these . . . claims uncertain and disrupt patentees' settled expectations regarding the scope of their claims" and should not be done unless the claim limitation contains nothing that can be construed as an act. *Id.* at 1327.

The first step of Claim 1 of the '833 patent states:

> A method of placing a floating craft having a hull with an upwardly curved bow onto a dry dock comprising the steps of . . .
>> selecting a plurality of floatation units from a first group of floatation units having a first buoyancy and a second group having a second buoyancy, the second group being less buoyant than the first group, so that the selected units have a total buoyancy sufficient to support the craft with its lowermost portion out of the water. . . .

'833 patent, col. 7, ll. 29-38. Because this claim does not employ the "step for" language that signals the drafter's intent to invoke § 112, paragraph 6, there is no presumption that this limitation is in step-plus-function format. *See Masco*, 303 F.3d at 1327. Moreover, the court agrees with Jet Dock that this claim does not trigger the provision because the claim only specifies a step and the act in support thereof, without the recital of a function. Specifically, the "selecting" step of Claim 1 recites a concrete act ("selecting") and the criteria to be employed when carrying out that act ("selected units have a total buoyancy sufficient to support the craft with its lowermost portion out of the water"). *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 2001 WL 912767 * 8 (S.D. Ind. June 14, 2001) (holding that claim limitation "method of heart stimulation . . . comprising the steps of . . . (b) *selecting* at least one mode of operation of the implantable

- 8 -

heart stimulator. . ." recited a sufficiently discrete action such that it did not invoke § 112, paragraph 6)

(emphasis added); *Civix-DDI, LLC v. Microsoft Corp.*, 84 F.Supp.2d 1132, 1149 (D. Colorado 2000)

(holding that method claim including step of "selecting" did not implicate § 112, paragraph 6); *see also*

*Adobe Sys. Inc. v. Macromedia, Inc.*, 201 F.Supp.2d 309, 317 (D. Del. 2002) (holding that use of

phrase "steps of" to introduce steps in method claim indicated that verb "storing" recited an act rather than

a function). Accordingly, the first step of Claim 1 will be interpreted in accordance with the normal

principles of claim construction and not subject to the strictures of § 112, paragraph 6.

## B. "Floatation Units"

Jet Dock argues that the term "floatation units" in Claim 1 must be given its ordinary and

accustomed dictionary meaning. It does, however, maintain that the term must be modified by the adjective

"airtight" because the '833 patent's specification excluded non-airtight floatation units from the patent's

scope by disclosing prior art that claimed "units . . . with bungholes so that the units could be partially

flooded to lower the water line of some or all of the units." (Pls.' *Markman* Br. at 4) (quoting '833 patent,

col.1, ll. 28-30). Zeppelin, on the other hand, maintains that the term "floatation unit" is so broad that one

skilled in the art could only understand the '833 patent's invention by referring to the patent specification.

Upon doing so, Zeppelin argues that it is clear that the drafter of the '833 patent limited the term "floatation

unit" to only "*hollow*, airtight flotation units." (Def.'s Response to Pls.' *Markman* Brief at 3) (quoting '833

patent, col. 1, ll. 66-67).[6]

---

[6]     In its briefing on summary judgment, Zeppelin had argued that the term should also be
limited by the modifiers "cubicle" and "having tabs." Because Zeppelin did not make these
arguments in its *Markman* briefing, the court will assume that the only modifiers Zeppelin
is arguing for are "hollow" and "airtight."

In accordance with *Texas Digital*, the court will begin its analysis with the ordinary meaning of the term "floatation unit." Webster's II New Riverside University Dictionary defines "unit" as: "[a]n individual, group, structure, or other entity regarded as an elementary structural or functional constituent of a whole." WEBSTER'S II NEW RIVERSIDE UNIV. DICTIONARY 1262 (1994); *see also* WEBSTER'S THIRD NEW INTERNAT'L DICTIONARY ("unit: . . . a single thing . . . that is a constituent and isolable member of some more inclusive whole") (attached as Exhibit A to Def.'s Response to Pl.s' *Markman* Brief). "Floatation" is "[t]he act or state of floating" and "floating" is defined as "[b]uoyed on or suspended in or as if in a fluid." WEBSTER'S II NEW RIVERSIDE UNIV. DICTIONARY 488-89. Thus, the ordinary meaning of "floatation unit" is: an individual structural constituent of a whole (*i.e.*, the dry dock) which is buoyed on a fluid (*i.e.*, water).

Next, the court must look to the intrinsic record to determine whether it is consistent with the ordinary dictionary meaning of this term. As noted above, Jet Dock argues that, in the patent specification, the drafter of the '833 patent evidenced his intent to avoid the prior art by modifying the term "floatation unit" with the adjective "airtight." As Jet Dock points out, it is a principle of claim construction that when it is reasonably possible to do so, claims should be construed to preserve their validity. *See, e.g, Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir. 1996). Nevertheless, a court is not unlimited in its ability to interpret a claim in accordance with this principle. Specifically, a court may not adopt a construction in order to avoid invalidity if there is only one reasonable interpretation of the claim term or if the construction is contrary to the term's plain meaning. *See, e.g., Process Control Corp. v. Hydreclaim Corp.*, 190 F.3d 1350, 1356-67 (Fed. Cir. 1999); *Rine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999); *see also Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376,

- 10 -

1384 (Fed. Cir. 2001) (noting that there is sometimes an inherent conflict in the rule of construction that claims are to be read broadly and unlimited to the specific embodiments in the specification and the rule that claims should be construed sufficiently narrowly to preserve their validity).

A review of the '833 patent's specification reveals that the drafter did not *expressly* distinguish the invention of the '833 patent from the prior art on the basis of whether the floatation units are airtight or not. His intent to do so, however, is implicit in his recitation of the fact that some of the floatation units in the prior art have been provided with bungholes so that they could be partially flooded to lower the water line of some or all of the units and his identification of the preferred embodiment of the invention as having "airtight" floatation units. While this evidence may not normally be sufficient to convince the court that "floatation units" should be modified by "airtight," there are several reasons why the court agrees with Jet Dock that it is in this case. First, there is no dispute between the parties that, without the modifier, the '833 patent would be rendered invalid. Second, the term "floatation unit" can reasonably be interpreted as covering only "airtight" floatation units. Lastly, and most importantly, Zeppelin agrees that "floatation unit" must be modified by the term airtight.[7]

Zeppelin next argues that "floatation unit" must be also be modified by "hollow." As noted above, it does so on the basis that the term "floatation unit" so deprives the claim of clarity that there is no means by which the scope of the claim can be ascertained without resort to the specification. Because the claimed "floatation units" are described in the '833 patent's "Summary of the Invention" and the "Description of

---

[7]     Of course, Zeppelin maintains that "airtight" must modify "floatation unit" based on the argument that without the modifier, the term is so devoid of clarity that one of ordinary skill in the art would not understand what is claimed by the '833 patent without it. As discussed immediately below, the court rejects this argument.

- 11 -

Preferred Embodiment" sections as "hollow," Zeppelin argues that the floatation units must be hollow. The court does not agree. Though a claim term may be broad, that fact does not mandate a finding that the term at issue is vague or indefinite. *See, e.g., Les Traitments Des Eaux Poseidon, Inc. v. KWI, Inc.*, 135 F.Supp.2d 126, 134 (D. Mass. 2001). Moreover, the term "floatation unit" "is not so amorphous that one of skill in the art can only reconcile the claim language with the inventor's disclosure by recourse to the specification." *Comark Communications, Inc. v. Harris Corp.* 156 F.3d 1182, 1186 (Fed. Cir. 1998). As evidence of this is the fact that both of the prior art patents that were disclosed in the '833 patent's specification use terms either identical or virtually identical to "floatation unit" to describe the individual constituents of the claimed floating docks. *See* United States Patent No. 3,824,644, abstract (using term "floating element"); United States Patent No. 4,604,962, abstract (using term "floating unit").

Further, Zeppelin is *not* asking the court to look to the specification to clarify the meaning of the term "floatation unit" as it is used in the context of the entirety of the invention claimed in the '833 patent. It is simply asking the court to look to the specification to limit the phrase to one embodiment of the invention. As the Federal Circuit has explained, using the specification in this way does not aid in a court's interpretation of a claim term as it does not "shed[] light on either the meaning of the term to the inventor, or the common meaning of the term to one of skill in the art." *Comark Communications*, 156 F.3d at 1186. Accordingly, the court does not find that the term "hollow" is necessary in order to clarify the meaning of "floating unit."

That being said, the court still must evaluate whether the drafter of the '833 patent clearly excluded non-hollow floatation units from the scope of the patent's coverage, keeping in mind the Federal Circuit's proscription of not reading limitations from the specification into the claim. On review of the specification,

- 12 -

  
the court finds that the drafter did *not* intend to disclaim all non-hollow floatation units. The drafter did not

act as his own lexicographer by clearly setting forth a definition of the term "floatation unit" in the

specification. *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir. 2003) (quoting *CCS*

*Fitness Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366-67 (Fed. Cir. 2002). While the Summary of the

Invention and the Preferred Embodiment describe the "floatation units" as "hollow," the drafter did not

expressly disclaim non-hollow units or describe  hollow units as being a particularly important feature of

the invention. *See id.* (explaining that two indices of when a patentee intends to use the specification to limit

the scope of an invention are when the patentee expressly disclaims subject matter or when he describes

a particular embodiment as important to the invention). Finally, the fact that the patentee only disclosed

hollow floatation units in the specification also does mean that the drafter disclaimed non-hollow units. *Id.*

(noting that "the number of embodiments disclosed in the specification is not determinative of the meaning

of disputed claim terms").

     Thus, for the foregoing reasons, the court finds that the term "floatation units," while limited by the

modifier "airtight," is not limited by the modifier "hollow."

## C. "Flexible Joint Between the Units"

     The second term that the parties dispute is "flexible joint between the units." Jet Dock again

maintains that the term should be given its ordinary meaning, arguing that the proper construction of the term

is "a connection which allows connected floatation units to move (that is, flex) with respect to each other

in the manner described in the '833 patent's claims. It does not matter how that independent movement

between units is achieved." (Pls.' *Markman* Br. at 8). It supports its argument by citing to a portion of

Claim 1, which describes "flexible joints" as "permit[ting] adjacent units to flex downwardly with respect

- 13 -

to each other upon the imposition of a downward load," (*id.*) (quoting '833 patent, col. 7, ll. 41-43), and to a portion of Claim 4, which describes how a craft's "hull presses downward on the top surface of at least some of the units so as to prevent those units from flexing with respect to the adjacent units," (*id.*) (quoting '833 patent, col. 8, ll. 18-20).   For its part, Zeppelin argues that the court must look to the patent specification to construe the term, and that upon doing so, it becomes clear that "flexible joints between the units" must be construed to mean the bendable, connecting tabs that protrude from the floatation units described in the specification.

Starting with the ordinary meaning of the phrase "flexible joint between the units" as it must, the court will look to the dictionary definition of each of the words in this phrase.  Webster's New Riverside University Dictionary defines "joint" as "[a] point or position at which two or more things are joined; . . . [a] configuration in or by which two or more things are joined."  WEBSTER'S II NEW RIVERSIDE UNIV. DICTIONARY 655; *see also* AMERICAN HERITAGE DICTIONARY 690 (2d ed. 1991) (same); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 651 (1991) (defining "joint" as "a part or space included between two articulations, knots, or nodes; . . . a place where two things or parts are joined").  "Flexible" is defined as "[c]apable of being bent or flexed," and "between" means "[i]n the interval or position separating."  WEBSTER'S II NEW RIVERSIDE UNIV. DICTIONARY 169, 487.  The "units" referred to in the phrase "flexible joint between the units" are the "floatation units" discussed above.  Thus, the ordinary meaning of the phrase "flexible joint between the units" is: a point or position in the interval or position separating the floatation units of the dock, which point or position is capable of bending or flexing.  As can be seen, this construction is consistent with Jet Dock's argument that there is no limitation on how the bending or flexing between the units is achieved.

- 14 -

Though Zeppelin argues that the phrase "flexible joint between the units" must be limited by the embodiment disclosed in the specification, it has not articulated any reason why the presumption in favor of the dictionary definition of the term should be overcome in this case. It has not even argued, as it did with "floatation units" that the term is so devoid of clarity that reference to the specification is necessary. It also has not argued or shown that the patentee acted as his own lexicographer by explicitly defining the "flexible joint between the units" as bendable connecting tabs between the units. Nor has it argued or shown that the patentee either disclaimed all flexible joints other than the tabs or that he described the tabs disclosed in the specification as being particularly important to the invention.

Several other facts support the conclusion that the presumption in favor of the ordinary meaning of the term "flexible joints between the units" has not been overcome in this case. First, as Jet Dock points out, the prior art listed in the "References Cited" section of the '833 patent demonstrate that one of ordinary skill in the art would know that there are many types of "flexible joints." (See Pls.' *Markman* Br. at 9) (quoting patents cited in '833 "References Cited" section). Second, the technical handbook cited by Jet Dock in its *Markman* brief, *Pictorial Handbook of Technical Devices,* depicts many different examples of joints. (See *id.* at 11) (citing Otto B. Schwartz and Paul Grafstein, *Pictorial Handbook of Technical Devices,* at 16-17, 96-97, 188-195, 476-483). Third, the language from Claims 1 and 4 that Jet Dock cites to supports the conclusion that the focus of the "flexible joint between the units" phrase is on the movement between the units, and not on how the movement is actually accomplished. Finally, both Allen Eva, one of the inventors of the '833 patent, and Gordon Kinder, the attorney who prosecuted the patent before the United States Patent and Trademark Office, testified at the *Markman* hearing that Claims 1 and 4 of the '833 patent, which cover methods of drive-on dry docking, may be practiced by any

- 15 -

connection between floatation units that allows the units to move with respect to each other. (*See* Tr. of *Markman* Hearing at 50, 62, 66).

Accordingly, the court finds that the phrase "flexible joint between the units" must be given its ordinary and accustomed meaning and is not limited to the bendable connecting tabs disclosed in the '833 patent specification.

## IV.  CONCLUSION

For the foregoing reasons, the two claim terms at issue in this case, "floatation units" and "flexible joints between the units," are construed in accordance with their ordinary and accustomed meaning. A "floatation unit," as the term is used in the '833 patent is: an individual structural constituent of a whole (*i.e.*, the dry dock claimed in the '833 patent) which is buoyed on water. A "flexible joint between the units," as used in the '833 patent is: a point or position in the interval or position separating the floatation units of the dock, which point or position is capable of bending or flexing.

If the parties wish to supplement their summary judgment briefing on the issue of infringement as a result of the court's claim construction of these two terms, they shall do so within ten days of this Order. Pursuant to this court's marginal entry Order of August 22, 2000, Jet Dock's response to Zeppelin's invalidity argument is due within fourteen days of this Order.

This case is hereby set for a telephonic status conference on October 6, 2003, at 4:30 p.m.

IT IS SO ORDERED.

/s/SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

September 19, 2003

- 16 -